JAMES F. CLAPP (145814)
jclapp@clapplegal.com
JAMIE N. HERRICK (356349)
jherrick@clapplegal.com
CLAPP LEGAL APC
701 Palomar Airport Road, Suite 300
Carlsbad, California 92011
Tel: 760-209-6565 ext. 101
Fax: 760-209-6565

EDWARD J. WYNNE (165819)
ewynne@wynnelawfirm.com
GEORGE R. NEMIROFF (262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
80 E. Sir Francis Drake Blvd. Ste. 3G
Larkspur, CA 94939
Tel: 415-461-6400
Fax: 415-461-3900

Attorneys for Plaintiff and the Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARLAND PEED V, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHELSEA FC HOLDINGS LIMITED,<br><br>Defendant. | CASE NO. 25CV2322-AGS-DDL<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Garland Peed V ("Plaintiff") brings this Class Action Complaint against defendant Chelsea FC Holdings Limited ("Defendant") on behalf of himself and all others similarly situated (the "Class Members"):

## INTRODUCTION

1. This is a consumer digital privacy class action. Plaintiff alleges Defendant violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA") as well as the California Invasion of Privacy Act, Cal. Penal Code §§ 631(a) and 638.51 ("CIPA") by knowingly disclosing to third parties, including Meta, Google, TikTok, LinkedIn, and X (formerly Twitter) the personally identifiable information and video-watching history of users of its ChelseaFC.com website (the "Website"), including Plaintiff and the Class Members, without their knowledge or consent.

2. The VPPA prohibits "video tape service providers" such as Defendant from knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," without their express consent in a stand-alone consent form.

3. Defendant collects and shares Website users' personal information through the use of tracking technologies called "pixels." Pixels are invisible snippets of code that monitor how users interact with a website. In this case, Defendant intentionally embedded pixels from Meta, Google, TikTok, LinkedIn, and X into its Website and configured them to transmit two types of information to these third-party companies: (1) data that an ordinary person can use to identify the user, and (2) the title of each video the user watched. These disclosures occurred without the user's knowledge or consent.

4. By engaging in this conduct, Defendant violated the privacy rights of Plaintiff and the Class Members under the VPPA and the CIPA.

## SUBJECT MATTER JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the VPPA.

///

2
FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 25CV2322-AGS-DDL

6. The Court has supplemental jurisdiction over the California claim under 28 U.S.C. § 1367(a) because the California claim is so related to the VPPA claim that the two claims are part of the same case or controversy. Both claims arise from the same conduct: Defendant's knowing use of pixels on the Website to capture and share the users' personally identifiable information to third parties without their consent. Both claims involve the same embedded pixels, the same transmissions of video titles and identifiers, and the same lack of consent, forming part of the same case or controversy.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PERSONAL JURISDICTION OVER DEFENDANT

8. The Court has specific personal jurisdiction over Defendant. As alleged below, Defendant purposely directs its activities at California and at the United States by owning and operating ChelseaFC.com, an interactive, commercial Website that targets and derives revenues from users in California and the U.S., including Plaintiff. Defendant also promotes in-person events in California and the U.S. by Chelsea Football Club through the Website.

9. Through the Website, Defendant offers substantial prerecorded video content, including match highlights and player interviews. In order to access this video content, users must create an account by giving Defendant their email address, thereby establishing a subscriber relationship. On information and belief, the Website has thousands of subscribers who reside in California and tens of thousands who reside in the U.S. According to industry estimates, the Website receives 500,000 visitors from the U.S. each month, representing about 10% of the Website's total traffic. Defendant does not prevent users in California or in the U.S. from visiting or subscribing to the Website or limit their access to video content on the Website.

10. Defendant optimizes delivery of the Website's prerecorded video content to subscribers in California and the U.S. by hosting video content on servers owned by CloudFront, a U.S.-based content delivery network (CDN). Upon receiving a request to watch a video from a subscriber in California or the U.S., the Website directs CloudFront to deliver the requested video content to the user from servers in the U.S., thereby reducing latency and improving playback performance. Defendant has also entered into a multi-year contract with Twilio, Inc., based in California, to have Twilio analyze how subscribers and other users interact with the Website. Defendant's use of U.S.-based vendors and infrastructure reflects Defendant's intentional servicing of the California and U.S. markets.

11. Through the Website, Defendant sells Chelsea-branded merchandise to consumers in California and the U.S. The Website has a dedicated U.S. storefront called usastore.chelseafc.com, which Defendant promotes as the official source for Chelsea-branded merchandise. Through this storefront, Chelsea accepts orders from consumers residing in California and the U.S. for delivery to the consumers' home addresses there. Defendant's sale of merchandise through the Website to consumers in California and the U.S. generates substantial revenue for Defendant.

12. Defendant further directs its activities toward California and the U.S. by promoting and selling tickets for events held there through the Website. For example, in 2022, the Chelsea Football Club held a pre-season training camp in Los Angeles, California and then played three exhibition matches in the U.S. Defendant offered access passes to the training camp and sold tickets through the Website. In 2024, Chelsea Football Club played five matches in the U.S., including one in Santa Clara, California. Defendant sold tickets to California residents through the Website, livestreamed the match through the Website, and later posted match highlights on the Website.

13. Through the Website, Defendant sponsors, promotes, and coordinates a network of Official Supporters Clubs (booster clubs), including approximately seven in California and 48 groups nationwide. Defendant exercises oversight and governance over these clubs by posting policies, event guidelines, and meeting minutes on the Website.

14. Finally, Defendant purposely targets Website users in California and the U.S. by embedding tracking pixels on the Website that collect and transmit their personally identifiable information and IP addresses to third-party advertising platforms—Meta, Google, LinkedIn, and X (formerly Twitter)—which are based in California. In order to use the pixels, Defendant was required to enter into contractual relationships with these advertising platforms.

15. Plaintiff's VPPA and CIPA claims arise directly from Defendant's conduct directed at California and the U.S. The alleged violations occurred in the course of Defendant's operation of the Website as a video platform that is intentionally offered to California and U.S. subscribers. Plaintiff's injuries would not have occurred but for Defendant's decision to target California and U.S. residents through the Website. Having deliberately cultivated a California and U.S. audience through the conduct described above, Defendant should reasonably expect to answer in this forum for privacy violations arising from those activities.

## PARTIES

16. Plaintiff is an individual residing in this District. At all relevant times, Plaintiff has been a subscriber of Defendant, having created an account with Defendant by submitting his email address.

17. Defendant is a private limited company incorporated in England and Wales with its principal place of business in London, England. Defendant owns and operates the Website. Defendant is not the entity that operates the Chelsea Football Club; that entity is called Chelsea Football Club Limited.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 25CV2322-AGS-DDL

18. As alleged below, by virtue of owning, operating, producing content for, and promoting the Website, Defendant is not only substantially involved in conveying video content to consumers, but its business is also significantly tailored to serve that purpose.

## FACTUAL ALLEGATIONS

19. Defendant knowingly installed tracking pixels from Meta, Google, TikTok, LinkedIn, and X on its Website. Defendant did not need to install the pixels to make the Website function. Rather, Defendant installed the pixels so that these advertising platforms would give Defendant valuable information about users of the Website, including demographic information, location, device type, and what videos the users watched and when. Defendant uses this information to support its revenue-generating activities, including sending targeted advertisements to potential customers and producing additional video content tailored to user demand.

20. Each pixel on Defendant's Website collects information that can be used to identify the user. For example, the Meta pixel collects the user's Facebook ID, a unique 15-digit number that is directly associated with the user's Facebook account, along with the Facebook browser identifier "fbp," another unique identifier that allows Meta to link the user's activity across sites. In addition to these identifiers, the pixels also transmit the user's IP address plus "fingerprint" information such as the user's browser, operating system, device, and screen resolution, which further assist in identifying the user. The Google, TikTok, LinkedIn and X pixels collect and transmit similar unique identifiers, IP addresses, and fingerprint information that allow these third parties to identify a user and track that user across websites. For example, Google's identifier is called cid, TikTok's is called ttp, LinkedIn's is called li_adsld, and X's is called muc_ads.

///

21. Each pixel on Defendant's Website also collects information about the videos the user watches on the Website. For example, the Meta pixel transmits the title of the video along with playback events such as when a video was played or paused. The Google, TikTok, LinkedIn and X pixels collect and transmit similar information, including the video title and playback information.

22. At various times during the limitations period, Plaintiff logged into the Website using his username and password and watched prerecorded videos. For example, in July 2025, Plaintiff logged in and watched the prerecorded videos entitled "Get to know: Joao Pedro" and "Joao Pedro is a Blue!" The Meta pixel was activated when Plaintiff clicked the video play buttons for those videos. Upon each activation, the pixel transmitted to Meta the video title Plaintiff was watching in two different fields, cd[pageFeatures].title and cd[buttonText], without any form of encryption or hashing. The pixel also transmitted to Meta Plaintiff's 15-digit Facebook ID, fbp, IP address, browser, operating system, device, and screen resolution. Using this information, an "ordinary person" could identify Plaintiff as having watched these two videos. The titles were in unencrypted form and therefore readable, and Plaintiff's name could be determined simply by entering Plaintiff's Facebook ID into any browser in the form www.facebook.com/[Facebook ID], which would call up Plaintiff's Facebook page. *See Eichenberger v. ESPN*, 876 F.3d 979, 985-86 (9th Cir. 2017) (noting a "Facebook link" "may very well readily enable an 'ordinary person' to identify an individual"). The Google, TikTok, LinkedIn and X pixels collected and transmitted similar information to those companies.

23. Plaintiff's and the Class Members' personally identifiable information—including their unique identifiers, IP address, fingerprint information, and video-viewing history—has independent economic value in the digital advertising and data brokerage markets. Companies like Meta, Google, TikTok, LinkedIn and X purchase, sell, and trade access to such data to

build consumer profiles and target advertising. Personally identifiable information is a form of currency in the modern economy, and its dissemination without consent deprived Plaintiff and the Class Members of the ability to control, monetize, or otherwise benefit from its economic worth. By transmitting Plaintiff's and the Class Members' personally identifiable information to third parties without authorization, Defendant conferred a measurable economic benefit on itself and those third parties while diminishing the market value of the personally identifiable information to its owner. Plaintiff's loss of control over the dissemination and economic exploitation of his personally identifiable information constitutes a concrete injury in fact, separate from statutory damages, because it deprived Plaintiff of the exclusive right to determine whether, how, and by whom his data is used for profit.

24. Defendant knew the pixels it installed on the Website would result in the disclosure of personally identifiable information to Meta, Google, TikTok, LinkedIn, and X. Each pixel is accompanied by publicly available and widely circulated implementation documentation, including developer guides and setup instructions, that expressly state that pixels transmit user data to their respective platforms. Installing the pixels on the Website required affirmative technical steps by Defendant, including embedding specific JavaScript code and defining event triggers. Upon installation, Meta, Google, TikTok, LinkedIn, and X transmitted event data and analytics reports back to Defendant through their advertiser dashboards, confirming receipt and processing of user data. There was no way Defendant could have integrated multiple pixels into the Website without knowing that personally identifiable information would be disclosed to Meta, Google, TikTok, LinkedIn, and X.

25. Defendant did not obtain Plaintiff's or any Class Member's prior written consent to disclosure of their personally identifiable information to these third parties, nor are users aware such disclosures occur. To obtain valid

consent under the VPPA, Defendant must tell the user what data is being disclosed, to whom, and for what purpose. Defendant must then obtain the user's express written consent to the disclosure, separate and apart from any general consent terms. Defendant never obtained consent from Plaintiff or the Class Members in a form that complies with the VPPA.

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action as a class action on behalf of all others similarly situated under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. The "Class" is defined as: "All persons in the United States who subscribed to the ChelseaFC.com Website and, during the statute of limitations, played a prerecorded video on the Website."

27. The "California Subclass" is defined as "All members of the Class who played a prerecorded video on the Website while physically located in the State of California."

28. Excluded from the Class and California Subclass are Defendant, its past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 U.S.C. § 455(b) and their immediate families.

29. The members of the Class and California Subclass are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that Class and California Subclass each consists of thousands of members.

30. Members of the Class and California Subclass can be identified from Defendant's records and from the records of the third parties to whom Defendant disclosed the private information, including Meta.

31. Plaintiff's claims are typical of the claims of members of the Class and California Subclass. Plaintiff and the members of the Class and California Subclass were harmed by the same wrongful conduct by Defendant. Plaintiff's

claims are based on the same legal theories as the claims of other Class and California Subclass members.

32. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class and California Subclass. Plaintiff's interests are not antagonistic to the interests of other Class or California Subclass members. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically.

33. Questions of law and fact common to the Class and California Subclass predominate over individualized questions. Such common questions include:

    a. whether Defendant knowingly disclosed Class and California Subclass members' private information to third parties;

    b. whether the private information disclosed to third parties is protectable under the VPPA and/or California law;

    c. whether the Class and California Subclass members consented to Defendant's disclosure of their private information to third parties; and

    d. the appropriate remedies for Defendant's conduct.

34. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence. The benefits of proceeding as a class action, including providing injured persons with a method for obtaining redress on claims that could not practically be pursued individually, substantially outweigh potential difficulties in management of this class action.

///

# FIRST CLAIM FOR RELIEF

(Violation of the Video Privacy Protection Act—By the Class)

35. Plaintiff incorporates the preceding paragraphs by reference.

36. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any consumer to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

37. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

38. Defendant is a "video tape service provider" under the VPPA because it is engaged in the business of delivering prerecorded audiovisual materials to consumers. By owning, operating, promoting, and continuously developing video content for the Website, Defendant is substantially involved in delivering such content as a core component of its operations. Defendant has positioned the Website as the primary online destination for Chelsea Football Club fans worldwide to access on-demand soccer-related videos about their favorite team. A search for "video" on the Website yields 4,764 results, indicating the Website has a massive library of prerecorded audiovisual materials, including full 90-minute match replays (posted shortly after games), extended highlights (often 10–20 minutes), player interviews, post-match reactions, behind-the-scenes features (e.g., "CFC Unlocked" episodes), and original programming. The Website is structured for easy discovery and consumption of these videos, with prominent navigation items such as "Latest" and "Watch" leading to dedicated subcategories including "News," "Interviews & Features," "Highlights," and "Originals." Defendant regularly produces and

uploads new prerecorded content—often daily around matchdays—such as recurring series like "[Player] is a Blue!" for signings, "Get to Know" player introductions, and popular originals like "Let Us Cook," where players attempt recipes under challenges. This large, regularly updated video library forms the central pillar of Defendant's digital fan-engagement strategy. As Defendant's Chief Digital Officer Phil Lynch stated in February 2025: "For many fans, regardless of their geographical location, digital connectivity is what brings them closer to the club, our players, and our history." (chelseafc.com/en/news/article/chelsea-welcomes-twilio-in-multi-year-partnership-to-support-fan-engagement, accessed Dec. 15, 2025). Far from being merely incidental to Defendant's other business activities, the Website's video content is a primary product that fans actively seek out and consume repeatedly, distinguishing it from ancillary promotional materials.

39.  As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider."

40.  Plaintiff is a "consumer" because he subscribed to audiovisual materials on the Website. Specifically, in order to access the entire library of video content on the Website, including the newest videos, Plaintiff was required to create an account on the Website by providing his full name, country, and email address, then choosing a password, and then verifying his email address by clicking a button on an email from Defendant. Plaintiff could not have accessed the newest videos on the Website without becoming a subscriber. Plaintiff completed the subscription process in approximately June 2025. The remaining Class members are also consumers because they followed the same process as Plaintiff to subscribe to the Website in order to access the full library of video content.

///

41. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" means "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Ninth Circuit has held that information constitutes personally identifiable information when it "readily permits an ordinary person to identify a specific individual as having watched specific video materials." *Eichenberger*, 876 F.3d at 985.

42. The information disclosed by the pixels is "personally identifiable information." For example, when a Class member plays a video on the Website, the Meta pixel transmits to Meta in unencrypted form the title of the video the Class member is watching along with the Class member's Facebook ID, fbp, IP address, browser, operating system, device, and screen resolution. An ordinary person can identify the specific video the Class member is watching simply by reading the unencrypted title. An ordinary person can learn the identity of the Class member simply by entering the person's Facebook ID, appended to "www.facebook.com/", into a browser connected to the internet.

43. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be: (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, either given at the time the disclosure is sought or in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent from Plaintiff or the other Class Members under this definition.

44. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

FIRST AMENDED CLASS ACTION COMPLAINT   CASE NO. 25CV2322-AGS-DDL

45. By installing the pixels on the Website, Defendant knowingly disclosed the Class members' personally identifiable information to Meta, Google, TikTok, LinkedIn, and X without their consent. As alleged above, there was no way Defendant could have integrated multiple pixels into the Website and received analytics reports from these third-party advertising platforms without knowing that the Class members' personally identifiable information was being disclosed.

46. As a result of these violations, Defendant is liable to the Plaintiff and the Class for actual damages related to their loss of privacy in an amount to be determined at trial, or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorneys' fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined at trial, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## SECOND CLAIM FOR RELIEF

(Violation of California Invasion of Privacy Act—By the California Subclass)

47. Plaintiff incorporates the preceding paragraphs by reference.

48. Plaintiff alleges Defendant violated the CIPA in two respects: (1) it aided Meta, Google, TikTok, LinkedIn and X in attempting to learn the contents of the California Subclass members' communications with Defendant, in violation of California Penal Code § 631(a), and (2) by embedding pixels in the Website, Defendant used a "pen register" to capture the routing, addressing, and signaling information of the California Subclass members' electronic communications without their consent, in violation of California Penal Code § 638.51(a).

49. **Section 631(a).** California Penal Code § 631(a) makes unlawful any attempt "by means of any machine, instrument, contrivance, or in any other manner" any of the following: … "(2) willfully and without the consent of all

parties to the communication, or in any unauthorized manner, reading or attempting to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; …. or (4) aiding, agreeing with, employing, or conspiring with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above.

50. The Meta, Google, TikTok, LinkedIn and X pixels are each a "machine, instrument, contrivance, or … other manner" used to read or learn the contents or meaning of communications between the California Subclass members and Defendant.

51. By allowing the installation of their pixels on the Website, Meta, Google, TikTok, LinkedIn and X intentionally read or attempted to learn the contents of the communications between the California Subclass members and Defendant. The "contents" of the communications consisted of titles of the videos each California Subclass member watched plus the unique identifiers associated with that California Subclass member—i.e., in the case of Meta, the Facebook ID and fbp; for Google, cid; for TikTok, ttp; for LinkedIn, li_adsld; and for X, muc_ads.

52. Meta, Google, TikTok, LinkedIn and X read or attempted to learn the contents of the communications while the communications were either "sent from" California or "in transit." The communications were "sent from" California because the California Subclass members and their browsers were physically present in California at the time they accessed the Website and the communications were sent. The communications were "in transit" because, through the operation of their respective pixels, Meta, Google, TikTok, LinkedIn and X received the California Subclass members' communications in real time, simultaneously with Defendant.

53. Meta, Google, TikTok, LinkedIn and X use the contents of the communications not just to provide analytics to Defendant but also for their own independent commercial purposes, including building customer profiles and tracking customer behavior across websites, enhancing their advertising platforms, and generating revenues separate from any arrangement with Defendant.

54. Defendant aided, agreed with, employed, permitted, or otherwise enabled Meta, Google, TikTok, LinkedIn and X to read and attempt to learn the contents of the California Subclass members' communications using their respective pixels. As alleged above, Defendant knew that by installing the pixels on the Website, the contents of the users' communications would be read and learned by Meta, Google, TikTok, LinkedIn and X.

55. The California Subclass members did not know of, or consent to, any third party's reading or learning the contents of their communications with Defendant, nor did the California Subclass members consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling that conduct.

56. Pursuant to Cal. Penal Code § 637.2, Plaintiff and the California Subclass members have been injured by Defendant's violations of Section 631(a) and are entitled to statutory damages of $5,000 per violation.

57. **Section 638.51(a).** California Penal Code § 638.51(a) prevents any person from "install[ing] or us[ing] a pen register … without first obtaining a court order."

58. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b).

59. The pixels described herein are "pen registers" because they are devices or processes that record the California Subclass members' IP addresses and "fingerprint" information, such as the user's browser, operating system, device, and screen resolution, from the electronic communications transmitted by the California Subclass members' browsers.

60. Defendant installed the pixels by embedding them into the Website script that is loaded into the California Subclass members' browsers. Defendant used the pixels to collect the California Subclass members' IP addresses and fingerprint information.

61. The California Subclass members did not provide their prior consent to Defendant's installation or use of the pixels.

62. Defendant did not obtain a court order to install or use the pixels.

63. Pursuant to Cal. Penal Code § 637.2, Plaintiff and the California Subclass members have been injured by Defendant's violations of Section 638.51(a) and are entitled to statutory damages of $5,000 per violation.

## **PRAYER**

Plaintiff, individually and on behalf of the Class and California Subclass, requests the following relief against Defendant:

1. An order certifying the Class and California Subclass and appointing Plaintiff as class representative and his attorneys as Class Counsel;

2. Actual and statutory damages according to proof;

3. Reasonable attorneys' fees and costs;

4. Pre-judgment and post-judgment interest;

5. An order enjoining Defendant from engaging in the unlawful conduct alleged herein; and

6. Such further relief that the Court deems proper.

///

///

# JURY DEMAND

Plaintiff demands trial by jury on all matters so triable.

Dated: December 16, 2025

Respectfully submitted,

CLAPP LEGAL APC
WYNNE LAW FIRM

*s/James F. Clapp*
JAMES F. CLAPP
Attorneys for Plaintiff and the
Proposed Class and California Subclass

# PROOF OF SERVICE

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Diego, State of California. My business address is 701 Palomar Airport Road, Suite 300, Carlsbad, California 92011.

On December 16, 2025, I served true copies of the following document(s) described as **FIRST AMENDED CLASS ACTION COMPLAINT** on the interested parties in this action as follows:

| | |
|---|---|
| Nima H. Mohebbi<br>nima.mohebbi@sidley.com<br>Sebastien Wadier<br>sebastien.wadier@sidley.com<br>SIDLEY AUSTIN LLP<br>1999 Avenue of the Stars, 17th Floor<br>Los Angeles, CA 90067<br>Attorneys for Defendant | Ian M. Ross<br>iross@sidley.com<br>Ana Pajar Blinder<br>ablinder@sidley.com<br>SIDLEY AUSTIN LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131<br>Attorneys for Defendant |

Edward J. Wynne
ewynne@wynnelawfirm.com
George R. Nemiroff
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
Wood Island
80 E. Sir Francis Drake Blvd., Ste. 3-G
Larkspur, CA 94939
Attorneys for Plaintiff

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth on the service list obtained from this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 16, 2025, at Carlsbad, California.

_____
Teri L. Zaayer